# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### ST. JOSEPH DIVISION

| | |
|---|---|
| ELDON RAZOR, II, | ) |
|     Plaintiff, | ) |
| v. | ) Case No. 5:13-cv-06083-NKL |
| CAROLYN W. COLVIN,<br>Acting Commissioner<br>of Social Security | ) |
|     Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Eldon T. Razor II's appeal of the Commissioner of Social Security's final decision denying his application for supplemental security income under Title XVI of the Social Security Act. For the following reasons, the Commissioner's decision is reversed, and the case is remanded for reconsideration.

**I.  Background**

Plaintiff Eldon Razor, a 44-year-old-man, was born in 1971 and has completed two years of college. Razor performed past work as a delivery driver, factory laborer, janitor, and food vendor at festivals. In his application filed on October 15, 2010, Razor alleges a disability onset date of October 15, 2010 stemming from chronic back pain,

osteoarthritis, and depression.[1] Razor has presently exhausted his administrative remedies.[2]

### A. Medical History[3]

In the spring of 2006, Razor presented at Broadlawns Medical Center with complaints of back pain. Randy Maigaard, M.D. ordered an MRI and prescribed Toradol for Razor's pain. [Tr. 465, 462]. A month later, Razor presented to Joseph Miller, D.O. with continued back pain, although Dr. Miller noted that Razor's pain was markedly improved with medication. [Tr. 459]. Dr. Miller referred Razor to physical therapy and scheduled a surgery consult. *Id*.

The MRIs taken around this time reveal that Razor suffered disc space narrowing, dehydration of the intervertebral discs, a disc bulge, and mild arthritis. [Tr. 448, 450, 462]. Razor continued reporting back pain over the course of 2006. On July 11, he saw Doug Hanson, M.D., complaining of back pain as well as gastroesophageal reflux, hemorrhoids, hyperlipidemia, and hypothyroidism. [Tr. 457]. Dr. Hanson prescribed Relafen and decided to follow with surgery for removal of Razor's external hemorrhoids. *Id*. On December 15, Razor presented to Alan Hilgerson, D.O. Razor again complained

---

[1] Razor initially alleged an onset date of May 1, 2005, but this date was amended to October 15, 2010 at Razor's hearing. [Tr. 33].
[2] Razor filed his initial application on October 15, 2010. This application was denied in 2011 and, after a hearing, an ALJ rendered an unfavorable decision in May 2012. Razor exhausted his administrative remedies and then filed an appeal with this Court. However, after the appeal was filed, Defendant determined that the original hearing could not be located, and so this case was remanded for a second hearing, held on June 15, 2015. The ALJ issued an unfavorable decision on July 21, 2015, and it is this decision Razor now challenges.
[3] Razor's medical record also details a history of mental impairments. Because he does not challenge the ALJ's decision regarding any mental impairment, however, the Court does not address this component of the record on appeal.

of back pain and reported that it hampered his ability to sit, walk, or lift. [Tr. 455]. Dr. Hilgerson prescribed cyclobenzaprine and referred Razor to an orthopedic specialist. *Id*.

On January 11, 2007, Razor presented to Dr. Jerome Bashara, M.D. for an orthopedic evaluation. [Tr. 451]. Dr. Bashara diagnosed Razor with degenerative disc disease of the lumbar spine and scheduled an epidural injection. [Tr. 453]. Thereafter, on October 4, 2008, Razor saw Daniel Baldi, D.O., who directed him to continue taking his pain medications. [Tr. 466]. The record indicates that Razor continued to take these medications, presenting at Putman Rural Health Clinic for refills from December 2009 through February 2011. *See* [Tr. 492]. Beginning in 2011, Razor then followed with the Wright Memorial Physicians Group, where he reported back pain and hip pain. [Tr. 483]. Razor began taking nobumetone and Lisinopril. [Tr. 479]. At Wright Memorial, Razor's back pain was primarily treated by Dawn Stout, BC-FNP. Ms. Stout gave Razor prescriptions for Hydroxyzine, Lidoderm, and Tramadol. [Tr. 502]. She also referred Razor for an orthopedic evaluation and a pain management consult. *Id*.

Razor presented to Brandon Sigrist, PA-C in June 2011 to determine Medicaid eligibility. Mr. Sigrist performed an examination and opined that Razor's lumbar flexion is "significantly limited." [Tr. 494]. Razor demonstrated tenderness through the lumbar paraspinal muscles and displayed discomfort from supine and bilateral sitting. *Id*. Mr. Sigrist did not find any hip pain or limitations. *Id*. After examining Razor and viewing an MRI of the lumbar spine from May 2006, Mr. Sigrist concluded that Razor had a disc protrusion and disc bulge, and that he was "a candidate for medical assistance." *Id*. Mr. Sigrist suggested physical therapy, pain management, and possibly getting injections.

3

[Tr. 494-95]. While "it doesn't appear that [Razor] can be gainfully employed," Mr. Sigrist opined, "hopefully with treatment his functional capacity may improve." [Tr. 494].

Razor presented to Dr. Dwayne E. Jones, M.D. on April 13, 2012. He reported neck, back, hip, and bilateral lower extremity pain. [Tr. 503]. Razor particularly complained of his lower back pain, which improved somewhat with medication but restricted his activities and made him irritable. *Id.* Dr. Jones evaluated Razor and examined a magnetic resonance scan done at Wright Memorial Hospital. Dr. Jones noted that the scan showed evidence of mild bilateral neural foraminal, narrowing at L4-5 and at L5-S1. *Id.* In his exam, Dr. Jones found that Razor walked with an antalgic gait, demonstrated limited forward flexion and extension, and showed tenderness along the paraspinous muscles. [Tr. 504]. Dr. Jones concluded that Razor suffered from myofascial pain and weakness, and recommended an interlaminar epidural steroid injection. [Tr. 505]. Dr. Jones administered this injection and prescribed Flexeril. [Tr. 506]. Afterwards, Dr. Jones remarked that the injection was successful, and he instructed Razor to follow up in two weeks. [Tr. 506, 508]. Razor later reported that the injection increased his pain. [Tr. 575]. The record does not indicate whether Razor returned for a follow-up consultation.

James P. Suchsland, D.O. performed a consultative examination in advance of Razor's hearing. Upon exam, Dr. Suchsland found that Razor demonstrated a full range of motion with his shoulder, elbow, wrist, knee, hip, cervical spine, and lumbar spine. [Tr. 531-32]. Dr. Suchsland further opined that Razor's upper and lower extremity

4

muscle strength was normal, although he noted that Razor gave a poor effort on these tests. [Tr. 532]. Similarly, Dr. Suchsland also observed that Razor displayed no muscle tenderness, atrophy, or spasms; while Razor complained of tenderness to lumbar palpatations, Dr. Suchsland remarked that Razor was grimacing even before any palpitation occurred. [Tr. 534]. Razor's gait was unremarkable, Dr. Suchsland noted, because although he carried a cane during his visit, Razor did not use it at all times, and even when using the cane Razor "did not seem particularly supportive on it." [Tr. 535].

Dr. Suchsland concluded that Razor displayed some evidence of lower back pathology, osteoarthritis, and neural foraminal narrowing. *Id*. Therefore, Dr. Suchsland opined that Razor could not carry heavy objects or stand or sit for a long time. *Id*. On the whole, however, Dr. Suchsland found the severity of Razor's ailments "fairly minimal" and stated that Razor is capable of performing a 40-hour work week with normal breaks. *Id*.

In addition, Razor's medical record also contains opinions submitted by Don Jackson, a vocational expert, and Dr. Stanley Hutson, Ph.D., a psychologist who examined Razor's record in December 2013. Mr. Jackson remarked that Razor suffers limitations when lifting, bending, stooping, twisting, and crawling. He wrote that Razor's "physical or mental impairment constitutes or results in a substantial impediment to employment." [Tr. 309].

Dr. Hutson opined that Razor suffered from severe discogenic and degenerative back disorders, as well as from osteoarthritis. [Tr. 90]. He concluded that Razor could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for

5

about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. [Tr. 93]. Dr. Hutson further found that Razor could occasionally balance and climb ladders. Otherwise, he did not find other physical limitations and concluded that Razor could perform light work. [Tr. 96].

Finally, Razor's wife, Jennifer Razor, and his friend, Theresa A. Van Horn, both completed Third Party Functional Reports that were included in the record. Jennifer wrote that she did the cooking, yard work, and driving because Razor is unable due to his back pain. [Tr. 318-20]. She noted that Razor cannot walk for more than 15 minutes, bend, or sleep for more than four hours without being disrupted by pain. [Tr. 320-21]. As a result, Jennifer wrote, Razor spends significant time in bed and has trouble leaving the house and socializing. [Tr. 324].

Ms. Van Horn, who stated she had been friends with Razor for five years, wrote in her report that she helps him with trash, cats, yardwork, and medications. [Tr. 411]. While Ms. Van Horn remarked that Razor does housework and dishes, and that he watches television and listens to music, she noted that he cannot sit for long periods without pain and requires assistance for some personal care. [Tr. 412]. Due to Razor's pain, Ms. Van Horn wrote, he uses a cane when he leaves the house to perform errands; he can only walk or stand for five minutes at a time; he cannot kneel, bend, reach, or climb stairs; and he is only capable of lifting five pounds. [Tr. 416-17].

At his hearing, Razor testified that he had been living with a friend, who serves as his caretaker, for the previous two years.[4] [Tr. 36]. Razor stated that he suffers from back pain caused by a bulging disk and three deteriorated disks, as well as from arthritis, hip pain, and ankle pain. This pain forces him to use a cane daily, Razor testified, although he does not have a prescription for it. *Id*. The pain also leads Razor to take medications such as Tramadol, Tizanidine, Lidocaine, Zolazepam, and Nexium, which as a side effect cause him memory loss and some dizziness. [Tr. 38-39].

Besides his medications, Razor testified that he tried treating the pain with an epidural in 2011, but "all that did was make it worse." [Tr. 42]. Razor never tried physical therapy because it was "not acceptable" and "would just make things worse." [Tr. 43].

Razor testified that his average day is spent taking pain medications and lying in bed. [Tr. 39]. Due to his pain, Razor stated he is only able to sit for 15-20 minutes and requires assistance showering and driving. [Tr. 39-40]. While Razor testified that he has a driver's license, he also has a driver who runs major errands with him. [Tr. 41, 43-44]. His friend, meanwhile, cooks, cleans, and does yard work around the house. [Tr. 41]. Razor estimated that he leaves his house about two times in a typical week. [Tr. 43]. Razor stated, however, that after his wife died he was able to take care of himself before the friend moved in, although he emphasized that his pain had gotten worse in the prior six months. [Tr. 41-42].

---

[4] Jennifer Razor died in 2012, three years before Razor's hearing.

A vocational expert also testified at Razor's hearing. In response to the ALJ's hypothetical question, which described an individual who could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk for four hours in an eight-hour workday; could sit for four hours in an eight-hour work day; could occasionally crawl, bend, balance, kneel, and use ramps or stairs; and who could not use ladders, ropes, or scaffolds, the vocational expert testified that there are light jobs within the national economy that an individual with these limitations could perform. [Tr. 45].

**B. ALJ's Decision**

After the hearing, the ALJ issued a decision on July 21, 2015. He found that Razor suffers from the following severe impairments: degenerative disc disease and degenerative joint disease/osteoarthritis of the bilateral hips. Relying on the vocational expert's testimony, the ALJ concluded that Razor is unable to perform past relevant work but, considering his age, education, experience, and limitations, Razor could find other jobs that exist in significant numbers in the national economy.

As part of this analysis, the ALJ assessed Razor's RFC as follows:

> [H]e can lift or carry 20 pounds occasionally and ten pounds frequently; he can stand or walk for four hours in an eight-hour workday; he can sit for four hours in an eight-hour workday; he can push or pull in the limits for lifting and carrying; he can occasionally crawl, bend, and kneel; he cannot use ladders, ropes, or scaffolds; he can occasionally use ramps and stairs; he can occasionally balance; he should not work at unprotected heights or around dangerous machinery; and he should avoid concentrated exposure to cold temperatures. He can have frequent contact with co-workers, supervisors, and the general public.

[Tr. 16].

The ALJ reached this RFC by giving "partial weight" to Dr. Hutson's opinion. In doing so, the ALJ noted that Dr. Hutson is familiar with the disability determination process, and that he rendered his opinion after conducting a comprehensive review of Razor's medical record. However, the ALJ discounted Dr. Hutson's conclusion that Razor has no functional limitations; instead, the ALJ determined that Razor has mild limitations in his daily activities. [Tr. 19].

Additionally, the ALJ gave "moderate weight" to Dr. Suchsland's opinion. While the ALJ credited Dr. Suchsland's overall opinion, which he found to be well-explained and well-supported by the findings of Razor's exam, the ALJ discounted as "vague" Dr. Suchsland's conclusion that Razor "cannot perform prolonged standing, prolonged ambulation, or carrying of heavy objects." [Tr. 19]. These limitations, the ALJ remarked, Dr. Suchsland had "failed to quantify." *Id.*

"Little weight" was given to the opinions of Mr. Sigrist, Dr. Jones, Jennifer Razor, and Theresa A. Van Horn. First, in discounting the opinion of Mr. Sigrist, the ALJ noted that Mr. Sigrist only examined Razor once, and that his mild findings were not consistent with his conclusion that Razor was unemployable—a conclusion not entitled any weight. The ALJ further observed, more generally, that Mr. Sigrist is not considered an acceptable medical source under the social security regulations. [Tr. 19-20].

Second, in discounting Dr. Jones' opinion, the ALJ similarly observed that Dr. Jones rendered his opinion after conducting a single examination and that, after finding some medical abnormalities, concluded only that Razor is "disabled." [Tr. 20]. Once

again, the ALJ wrote, this conclusion is inconsistent with Dr. Jones' examination and is not entitled weight. *Id*.

Third, the ALJ gave little weight to the Third Party Function Reports because they were not provided by acceptable medical sources and were cumulative of Razor's own testimony, which lacked credibility. *Id*.

The last opinion assessed by the ALJ, Mr. Jackson's, was given "minimal weight." The ALJ found that Mr. Jackson is not a medical source, that he provided broad observations without actually assessing Razor's functional limits, and that he apparently based his conclusions only on Razor's complaints. [Tr. 21].

Finally, the ALJ determined that Razor's complaints were not entirely credible. While the ALJ noted evidence demonstrating Razor suffered a broad-based disc bulge with facet hypertrophic changes, central canal narrowing, and bilateral neuroforaminal narrowing, he discounted Razor's statements concerning the effects of the resulting pain. [Tr. 17]. The ALJ reached this conclusion after considering inconsistencies in Razor's testimony and across the medical record; Razor's failure to follow treatment advice; Razor's "quite poor" work history; and evidence that Razor's daily activities were not as restricted as Razor had suggested. [Tr. 18-19]. Accordingly, the ALJ found that Razor's "allegations regarding the intensity, persistence, and limited effects of his impairments [was] not fully credible." [Tr. 19].

## II. Discussion

A district court will reverse the Commissioner's findings "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Razor argues that the ALJ's credibility determination is not supported by substantial evidence on the record as a whole. Razor further argues that the ALJ erred in formulating his RFC because he gave weight to the opinion of Dr. Suchsland, the consultative examiner, even though it was inconsistent with the remainder of the record. Instead of relying on Dr. Suchsland's opinion, Razor contends, the ALJ was under an obligation to develop the record more fully.

**A. Credibility**

Razor first challenges the ALJ's credibility findings. In his decision, the ALJ found that Razor's medical impairments could reasonably cause the alleged symptoms. He concluded, however, that Razor is "not fully credible" regarding the claimed severity of these symptoms. [Tr. 19].

A court generally will not disturb an ALJ's credibility determinations. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). As such, "[i]f an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [a court] will normally defer to that judgment." *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990). Such a determination must "recognize[] and consider[]" the factors set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include: (1) a claimant's daily activities; (2) the duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of

11

medication; and (5) functional restrictions. *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004). In addition, a "claimant with a good work record is entitled to substantial credibility." *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir. 1984).

Razor does not dispute that the ALJ considered the *Polaski* factors at length before discounting his credibility. He argues, however, that the ALJ's conclusion is not supported by substantial evidence. While the ALJ noted that Razor's allegations of pain were not consistent across exams, Razor maintains that he displayed decreased range of lumbar motion on all exams except one, *see* [Tr. 573], and an impaired gait on Dr. Jones' exam and in most of Ms. Stout's notes, *see* [Tr. 504, 575-80]. While the ALJ found that Razor did not pursue recommended treatment regimens, Razor contends that he did not get a second epidural injection because the first failed to alleviate his pain, *see* [Tr. 575], and that he was only referred for physical therapy before his alleged onset date, *see* [Tr. 459]. Finally, while the ALJ wrote that Razor performed some household chores, which the ALJ found inconsistent with his allegations of being bedridden, Razor argues that the record reflects he performed chores only infrequently and instead spent most of his time lying around and watching television. *See* [Tr. 276, 294, 410, 492].[5]

---

[5] Razor also challenges that ALJ's discussion of his daily living because, in that discussion, the ALJ wrote: "[Razor's] activities of daily living are detailed at length in the discussion of the "paragraph B" criteria above, and that discussion will not be repeated here." [Tr. 19]. According to Razor, because "Paragraph B" only pertains to mental impairments, the ALJ did not sufficiently discuss Razor's daily activities for purposes of his physical impairments. The Court does not find this argument persuasive. In referencing his earlier discussion, the ALJ was not indicating that Paragraph B applies to Razor's physical pain, or more generally, that his evaluation of mental impairments was equally applicable to Razor's physical impairments. Rather, after discussing Razor's credibility at length, the ALJ merely noted that he had previously listed Razor's daily activities, a list that did not need repeating. The ALJ's reference to another part of his opinion thus did not constitute rote reliance on that section. Accordingly, the case cited by Razor, *Putnam v. Colvin*, 2014 WL 5320947 (W.D. Mo. Oct. 17, 2014), is distinguishable.

Razor has identified some facts emphasized by the ALJ that do not constitute substantial evidence. For example, the ALJ remarked that Razor did not follow-up after Dr. Jones administered an epidural injection on April 25, 2012; however, the ALJ overlooked that Razor complained of worsened symptoms after his injection and did contact Dr. Jones, who prescribed Flexeril. [Tr. 575]. Additionally, the ALJ noted that Razor "is able to perform all of his household chores, including shoveling snow," [Tr. 19], yet the record reflects only that Razor complained of pain after "scooping snow," [Tr. 492]. This does not demonstrate that Razor could shovel snow; if anything, it suggests the opposite. The ALJ may not pick and choose stray facts to fit a particular narrative. *See Reed v. Barnhart*, 399 F.3d 917, 924 (8th Cir. 2005).

However, if the ALJ otherwise offered "a good reason" for discounting Razor's credibility, *Dixon*, 905 F.2d at 238, the above errors are harmless and the Court will nevertheless defer to the ALJ's judgment. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1193 (E.D. Mo. 2004) (despite some inaccuracies in the ALJ's decision, it also contained "numerous, valid reasons in support of the credibility determination"); *see also Renfrow v. Astrue*, 496 F.3d 918, 919 (8th Cir. 2007) (remand is unnecessary if an error is harmless).

On a broad level, Razor's record is still rife with inconsistencies, many of which were pointed out by the ALJ in his decision. Notably, although Razor testified at his hearing that he requires a caretaker and a driver to perform most of his daily activities, [Tr. 36, 40], he also testified that he lived alone for a year after his wife's death and was able to care for himself during that time, [Tr. 41]. Moreover, Razor testified that his

typical day consists of taking medications, eating, and lying down, *see* [Tr. 39], and that he requires help even getting into the shower, [Tr. 42]; but the medical record—and indeed, the third party statement submitted by Ms. Van Horn—indicates that Razor can perform housework such as washing dishes, changing the cat litter, doing laundry, preparing meals, and mowing the lawn, [Tr. 412, 521, 276]. Inconsistencies in Razor's medical symptoms are also prevalent throughout the record. For example, even setting aside Dr. Suchsland's opinion, the source identified by Razor as his prime caregiver—Ms. Stout—noted on multiple occasions that Razor's gait was "normal," *see* [Tr. 551, 577], even though he testified to needing a cane every day when walking, [Tr. 37].[6]

Outside of the medical record, the ALJ noted several other factors that call Razor's credibility into question. First, although Razor's application listed an alleged onset date of May 1, 2005, he amended this date at his hearing to October 15, 2010 without providing an explanation for the five-year discrepancy. [Tr. 33]; *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990) (changing an alleged onset date may be inconsistent with testimony of longstanding severe pain). Second, as the ALJ observed, Razor's work history is "quite poor." [Tr. 19]. Razor's highest-earning year on the record was 1993, during which he earned $5,216.54. [Tr. 244]. Razor further has not reported any income

---

[6] Regarding physical therapy, Razor points out that the record contains referrals for physical therapy only prior to his alleged onset date. To be sure, Razor's inability to follow a treatment regimen before his onset date does not reflect the severity of his present impairment. *Hayek v. Colvin*, 2013 WL 5425966, at *19 (D. Minn. Sept. 27, 2013). However, medical observations preceding the alleged onset date are still relevant to Razor's medical history and credibility. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004). Razor's record reveals that he did not pursue physical therapy, either before or after his onset date. *See* [Tr. 43, 455]. The ALJ did not err in considering this evidence.

14

since 1999. [Tr. 270]. This detracts from Razor's credibility. *See Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015).

Simply put, while Razor's record consistently indicates that he suffers from back disorders and back pain, the record otherwise contains numerous inconsistencies regarding the severity of this pain. *Brown v. Barnhart*, 390 F.3d 535, 541 (8th Cir. 2004) (even where the record is clear that the plaintiff suffers chronic pain, severity must still be assessed to determine disability). It is in precisely these situations where district courts will defer to the ALJ, who actually observed the claimant at the hearing. *Pearsall*, 274 F.3d at 1218.

Accordingly, the Court cannot say the ALJ erred in his credibility assessment.

**B. Formulation of the RFC**

A claimant's RFC reflects "what the claimant can still do" despite the combined effects of her credible limitations. *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 416.945. In formulating an RFC, "the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect" her exertional capacities. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). The claimant nevertheless carries the burden of proving her RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

Razor argues that the ALJ did not base the RFC on substantial evidence. The ALJ relied on the opinion of Dr. Suchsland, to which he accorded "moderate weight," even though Dr. Suchsland was a consultative examiner who only observed Razor once and

made several observations not corroborated elsewhere on the record. Therefore, Razor maintains, Dr. Suchsland's opinion cannot constitute substantial evidence.

As a consultative examiner, the ALJ may consider Dr. Suchsland's opinion when determining the severity of Razor's allegations. *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004). However, this opinion will not generally alone constitute substantial evidence, especially if it is contradicted by a treating physician on the record. *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001).

While Razor contends that Dr. Suchsland's opinion is inconsistent with the record as a whole, he does not argue that the ALJ should have relied instead on the opinions provided by Mr. Sigrist or Dr. Jones, presumably because neither of these opinions delineates any functional limitations.[7] Instead, Razor argues that the ALJ should have developed the record further by ordering another consultative exam.

Having examined Razor's record and RFC, the Court finds that the functional limitations described by the ALJ are drawn from Dr. Hutson's opinion, which is the only opinion on the record that offers limitations with any specificity and the only functional assessment the ALJ afforded any weight.[8] Dr. Hutson opined that Razor could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally balance and climb ladders. [Tr. 93]. These conclusions are

---

[7] Mr. Sigrist and Dr. Jones concluded only that Razor was disabled, an opinion that does not constitute substantial evidence. 20 C.F.R. § 416.927(d).

[8] The ALJ gave "minimal weight" to the opinion of Mr. Jackson, who opined that Razor suffers limitations when "lifting, bending, stooping, twisting, and crawling." [Tr. 309]. However, Mr. Jackson did not quantify these limitations, and so the ALJ discounted Mr. Jackson's opinion because "he did not provide a specific assessment of [Razor's] ability to perform basic work activities." [Tr. 21].

largely reflected in Razor's RFC. The ALJ deviated from Dr. Hutson only in assessing greater functional limits in several areas: the ALJ found that Razor could only stand or walk for four hours in a workday, could only sit for four hours in a workday, and that he could never use ladders. [Tr. 16].

Dr. Hutson did not examine Razor and his opinion appears substantially based on Dr. Suchsland's consultative exam. *See* [Tr. 92]. However, the ALJ specifically discounted Dr. Suchsland's opinion, in part, because although Dr. Suchsland "opined that [Razor] cannot perform prolonged standing, prolonged ambulation, or carrying of heavy objects, . . . he failed to quantify those limitations." [Tr. 19]. Razor's RFC therefore rests upon unsustainable reasoning: it is drawn from the limitations assessed by Dr. Hutson, which are in turn based upon the limitations assessed by Dr. Suchsland, which the ALJ specifically discounted as "vague." *Id*. The record otherwise lacks any quantifiable estimation of Razor's functional capacity.

Considering the wide discrepancies in Razor's medical record—which depicts either an individual bedridden by back impairments or, alternatively, one who magnified his symptoms and could effectively manage his pain—the Court does not see how the ALJ could have reached a middle-ground RFC on the evidence before him. While Razor bears the burden of proving he is disabled, the ALJ must base any functional limitations on some medical evidence. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001). An ALJ should thus "obtain medical evidence that addresses the claimant's ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (internal

quotations omitted).  Based on the record before the Court, the limitations articulated by the ALJ plainly lack this requisite degree of supporting medical evidence.

Consequently, Razor argues that the ALJ did not adequately develop the record and that he "should have ordered a consultative examination to determine the extent of Razor's limitations." [Doc. 11, p. 13].  The Court will remand for the ALJ to make this determination.  If the ALJ finds that the record contains sufficient "medical evidence about how [Razor's] impairments affect his ability to function now," the ALJ has satisfied his duty to fully and fairly develop the record, provided that he formulates an RFC that actually relies on this evidence.  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).  However, if the ALJ finds that the record does not contain sufficient medical evidence to determine Razor's functional capacity, he must develop the record further so that such a determination can be made.

## III. Conclusion

For the reasons set forth above, the ALJ's decision is reversed, and the case is remanded for reconsideration.  On remand, the ALJ should reevaluate Razor's RFC based on evidence contained on the record.  If the record does not contain sufficient medical evidence about how Razor's impairments affect his ability to function, the ALJ should develop the record further before reassessing the RFC.

s/ Nanette K. Laughrey
                                                                NANETTE K. LAUGHREY
                                                                United States District Judge

Dated:  June 13, 2016
Jefferson City, Missouri